## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **VAPORETTI LLC and SUNSHINE VAPE LLC,**<br><br>    *Plaintiffs,*<br><br>**v.**<br><br>**RHODE ISLAND DEPARTMENT OF REVENUE; THOMAS VERDI, in his official capacity as Director of the Department of Revenue; RHODE ISLAND DIVISION OF TAXATION; NEENA S. SAVAGE, in her official capacity as Tax Administrator for the State of Rhode Island; RHODE ISLAND DEPARTMENT OF HEALTH; and JEROME LARKIN, MD, in his official capacity as Director of the Rhode Island Department of Health,**<br><br>    *Defendants.* | **C.A. No. 24-cv-00497-MSM-LDA** |

### DEFENDANTS' OBJECTION AND MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants[1] hereby object to the Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") filed by Plaintiffs Vaporetti LLC and Sunshine Vape LLC. Plaintiffs have not shown a likelihood of success on their constitutional challenges to the State of Rhode Island's rational and evidence-based decisions to ban the sales of flavored vaping products in order to safeguard Rhode Island's youth and otherwise protect the public health. Moreover, a

---

[1] Defendants are the Rhode Island Department of Revenue; Thomas Verdi, in his official capacity as the Director of the Department of Revenue; the Rhode Island Division of Taxation; Neena S. Savage, in her official capacity as Tax Administrator for the State of Rhode Island; the Rhode Island Department of Health ("RIDOH"); and Jerome Larkin, M.D., in his official capacity as Director of the Rhode Island Department of Health.

1

ban on the sales of flavored vaping products has already been in effect for *over five years*, and the statute that is being challenged in this lawsuit was in June 2024, yet Plaintiffs inexplicably waited for six months before filing suit. That delay severely undermines Plaintiffs' assertion of an emergency that warrants this Court taking the extraordinary step of preliminarily enjoining a democratically enacted statute before a full record can be developed. And the equities and public interest strongly counsel against reversing and nullifying the State's efforts over to prepare for the scheduled enforcement (on January 1, 2025) of a law that was passed pursuant to the state's police powers as a public health measure. Accordingly, Defendants respectfully request that this Court deny Plaintiffs' Motion.

## I.    INTRODUCTION

As of the date of this filing, the "sale, or offer for sale of, or the possession with intent to sell or to offer for sale, flavored electronic nicotine-delivery system ["ENDS"] products to consumers within the State of Rhode Island" is currently "prohibited" by state law, and has been prohibited since October 4, 2019. 216-RICR-50-15-6.10(A); *see* Ex. A (RIDOH, "Rhode Island Regulations Prohibit the Sale of Flavored Electronic Nicotine Delivery System (ENDS) Products"). Originally issued by RIDOH as an emergency regulation on that date, the final rule banning the sale of flavored ENDS (or "vaping") products was codified at 216-RICR-50-15-6 (the "Rule") on March 26, 2020. *See* Ex. B (RIDOH, "Emergency Notice of Changes in Regulations that May Affect Your Business"); Ex. C (RIDOH, "Final Rule Takes Effect March 26, 2020").

RIDOH issued the emergency regulation and the Rule to combat the "youth vaping crisis" facing the State. Ex. D (RIDOH, "The Statement of Reasons for Finding Imminent Peril", https://health.ri.gov/licenses/detail.php?id=288#section2). "In 2018, the Centers for Disease Control and Prevention (CDC), Food and Drug Administration (FDA), and United States Surgeon

General all declared youth e-cigarette use a national epidemic, pervasive in every state[,]" with flavored ENDS products representing a specific area of concern. *Id.*; *see id.* ("81% of youth e-cigarette users reported their first use of an ENDS product was a flavored ENDS product … Youth and young adults report using ENDS products because they like the flavorings/taste, they perceive the product as less harmful/less toxic, and they find the marketing and advertisement campaigns alluring. … Further, 31% of teenagers said they started vaping because of the flavor availability.").

Accordingly, the Rule bans the sale of ENDS products with a "characterizing flavor", which is defined under the Rule as a "distinguishable taste or aroma (other than the taste or aroma of tobacco)." 216-RICR-50-15-6.3(A)(2).   Among other provisions, the Rule also sets the requirements for obtaining a license "to engage in the business of selling electronic nicotine-delivery system products in the State of Rhode Island," which include a dealer's "self-certif[ication], at the time of initial application and every [annual] renewal application under [the Regulation], that none of the electronic nicotine-delivery system products they sell, or offer for sale, or possess with intent to sell or offer for sale to consumers in Rhode Island are flavored electronic nicotine-delivery system products." 216-RICR-50-15-6.7(A), -6.10(B).   "Compassion centers and licensed cultivators registered with the Rhode Island Department of Business Regulations--Office of Cannabis Regulation under R.I. Gen. Laws Chapter 21-28.6" are exempted from the Rule's prohibition on the sale of flavored ENDS products. 216-RICR-50-15-6.10(A).

In 2024, the General Assembly began to consider the legislation that would ultimately be passed into law as Public Law 2024, Chapter 117, Article 6, § 17, and codified (in relevant part) at R.I. Gen. Laws § 44-20-61 (the "Act").   In a March 5, 2024 letter to the Chair of the House Committee on Finance, then-Interim Director of RIDOH Utpala Bandy, MD, MPH, ("Dr. Bandy"), wrote "in strong support of [those] tobacco and nicotine control and prevention initiatives" as

"public health-aligned, evidence-based approaches to reduce tobacco and nicotine access and use and related adverse health outcomes and health disparities." *See* ECF 1-4 at 2. Dr. Bandy noted that, while Rhode Island initially "experienced significant decreases in total e-cigarette unit sales and unit sales of flavors other than tobacco" after the emergency regulation and Rule went into effect, the State has more recently experienced a "concerning trend increase in both flavored e-cigarette use and sales." *Id.* at 3.

As enacted by the General Assembly on June 13, 2024 and signed into law by the Governor on June 17, 2024, the Act provides, in relevant part, as follows:

**"§ 44-20-61. Product restrictions on electronic nicotine-delivery system products. [Effective January 1, 2025.]**

**"(a)** For purposes of this section, the following terms shall have the following meanings:

"**(1)** 'Characterizing flavor' means a distinguishable taste or aroma, other than the taste or aroma of tobacco or menthol, distinguishable by an ordinary consumer, imparted either prior to, or during, consumption of an electronic nicotine-delivery system product or component part thereof, including, but not limited to, tastes or aromas relating to any fruit, mint, wintergreen, chocolate, vanilla, honey, candy, cocoa, dessert, alcoholic beverage, herb, or spice or which impart a cooling or numbing sensation. The determination of whether an electronic nicotine-delivery system product has a characterizing flavor shall not be based solely on the use of additives, flavorings, or particular ingredients, but shall instead consider all aspects of a final product including, but not limited to, taste, flavor and aroma, product labeling, and advertising statements. A flavor shall be presumed to be a characterizing flavor if a dealer, manufacturer, or distributor has made a statement or claim directed to consumers or the public about such flavor, whether expressed or implied, that it has a distinguishable taste or aroma (other than the taste or aroma of tobacco or menthol).

**"(2)** 'Flavored electronic nicotine-delivery system product' means any electronic nicotine-delivery system product that imparts a characterizing flavor.

**"(b)** The sale, or offer for sale of, or the possession with intent to sell or to offer for sale, flavored electronic nicotine-delivery system products to consumers within the state of Rhode Island is hereby prohibited. Compassion centers and licensed cultivators registered with the state of Rhode Island department of business regulation-office of cannabis regulation under chapter 28.6 of title 21 are exempt

4

> from this provision except as to products that contain, are made of, or are derived from tobacco or nicotine, natural or synthetic."

P.L. 2024, ch. 117, art. 6, § 17, as codified at R.I. Gen. Laws § 44-20-61. The Act, which is scheduled to take effect on January 1, 2025, also provides that enforcement authority over the flavored ENDS ban will be transferred from RIDOH to the Department of Revenue, and imposes a tax on ENDS products. *See* Ex. E (DOR, Notice 2024-04); Ex. F (DOR, "Electronic Nicotine-Delivery Systems (ENDS) aka Vapes", https://tax.ri.gov/tax-sections/sales-excise-taxes/ends-tax). Since the Act was passed in June, the Department of Revenue's Division of Taxation has been preparing for that transition, including by issuing public notices and other forms of guidance regarding the Act.

Plaintiffs, two Rhode Island limited liability companies that are both "primarily engaged in the business of selling electronic cigarettes and related products, including flavored vapor products[,]" filed this suit against the Defendants on November 26, 2024, seeking declaratory and injunctive relief against any future enforcement of the Act or the Rule by the Defendants, as well as vacatur of those laws' bans on the sale of flavored ENDS products. Compl. at ¶¶ 1-2, p. 25. Both Plaintiffs state they were already in the business of selling flavored ENDS products, even though doing so has been prohibited in Rhode Island since October 2019. *Id.* ¶¶ 30-31. Although Plaintiffs acknowledge that they are and have been aware of that prohibition, they assert that "RIDOH has not enforced" either the emergency regulation or the Rule. *Id.* ¶ 47. Through their Motion, Plaintiffs now seek a temporary restraining order, and a preliminary injunction, against any future enforcement of the Act or the Rule. *See* ECF 5-1.

## II.    STANDARD OF REVIEW

Preliminary injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008); *see Mazurek v.*

*Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d ed. 1995)).  The movant bears the burden of establishing that (a) it is likely to succeed on the merits; (b) it is likely to suffer irreparable harm in the absence of preliminary relief; (c) the balance of equities tips in its favor; and (d) an injunction is in the public interest. *See Winter*, 555 U.S. at 20.  The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

Additionally, a party challenging the constitutionality of a legislative act bears a heavy burden to overcome the presumption that the act is constitutional.  A statute enacted by the Rhode Island General Assembly enjoys the "presumption of constitutional validity." *Rhode Island Medical Soc. v. Whitehouse*, 66 F. Supp. 2d 288, 305-306 (D.R.I. Aug. 30, 1999); *see McDonald v. Bd. of Elec. Com'rs of Chicago*, 394 U.S. 802, 809 (1969) ("Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them.").

## III.    ARGUMENT

### A. Plaintiffs Have Not Shown a Likelihood of Success on the Merits

"To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012). Despite raising a litany of constitutional challenges to the Act in their Motion, Plaintiffs have not shown a likelihood of success on any of them.

### 1. Plaintiffs Have Not Shown a Likelihood of Success on their Due Process Claim that the Act is Irrational

First, Plaintiffs assert that the Act violates their due process rights because the flavored ENDS ban is irrational.[2]  That claim clearly fails: the Act, which bans the sale of a product that is detrimental to the public health, is rationally related to a legitimate public interest.  Plaintiffs have correctly conceded that rational basis is the proper standard of review for their due process claims. *See* ECF 5-2 at 9-10 (citing *Mulero-Carrillo v. Román-Hernández,* 790 F.3d 99, 107 (1st Cir. 2015)).  "In conducting rational basis review, courts are not tasked with deciding whether a better or more effective means of classification exists." *González–Droz v. González–Colón*, 660 F.3d 1, 11 (1st Cir. 2011).  "While the [law] may draw an imperfect line, that circumstance alone does not render it unconstitutional." *Id.*  "The wisdom of the [legislature's] choice is not within the judiciary's purview." *Id.*  As a result, Plaintiffs' assertions that a different system of flavored

---

[2] Because the sale of flavored ENDS products is banned by both the Act and the Rule, Plaintiffs ask this Court to enjoin the enforcement of both.  In their Motion, however, Plaintiffs primarily attack the Act, and do not develop any separate arguments as to why the Rule, which they refer to as "the Emergency Regulations," is unconstitutional. ECF 5-2 at 4; *see id.* (asserting that the Emergency Regulations "similarly violate Plaintiffs' constitutional rights and threaten irreparable harm").  Accordingly, Defendants' arguments in this memorandum will primarily refer to the Act, but Defendants' arguments in defense of the Act also apply to the Rule and demonstrate why Plaintiffs cannot show a likelihood of success on their attempts to challenge the Rule.

ENDS regulation could more effectively protect the public health are ultimately irrelevant to this Court's inquiry. *See* ECF 5-2 at 10; Compl. at ¶¶ 16-25. In order to show that the Act is irrational, Plaintiffs must do much more than present a reasonable—or even a potentially preferable—alternative to the Act: rather, they "have the burden to negative every conceivable basis which might support it[.]" *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993) (internal quotation marks and citation omitted).

Plaintiffs cannot succeed under that standard. They concede, as they must, the State possesses a valid and legitimate interest in "curbing youth access to flavored ENDS products[.]" ECF 5-2 at 10. As a matter of common sense, it is most certainly rational for the State to have concluded that removing flavored ENDS products from the marketplace altogether would advance the goal of preventing the State's youth from using those products. *See Beach Communications, Inc.*, 508 U.S. at 315 ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."); *see also Take Five Vending, Ltd. v. Town of Provincetown*, 615 N.E.2d 576, 578, 580 (Mass. 1993) (holding that municipal by-law banning *any* sales of cigarettes through vending machines, with the purpose of "restrict[ing] minors' access to cigarettes," was "entirely consistent with" and did not "detract from, but rather augment[ed]" a state law banning vending machine sales of cigarettes to minors).

The fact that state law separately bans sales of *any* ENDS products to individuals under the age of 21 does not mean that the Act "does nothing more to promote [the] admittedly legitimate governmental interest in curbing youth access to flavored ENDS products" by specifically prohibiting the sale of flavored ENDS products. ECF 5-2 at 10. Although the State does not need to substantiate its rationales through factual evidence in order to pass rational basis review, *see Beach Communications, Inc.*, 508 U.S. at 315, Dr. Bandy's March 2024 letter makes clear that

such evidence exists. *See* ECF 1-4 at 3 (noting studies from Providence and Massachusetts showing that the restrictions on sales of flavored tobacco products are associated with a reduction in youth use of tobacco products "including cigarettes and e-cigarettes"). It is also worth noting that, after the federal government banned the sale of flavored cigarettes (with the exception of menthol) to persons of any age in 2009, the use of cigarettes by minors dropped significantly—despite the fact that, at the time of the federal ban, all fifty states already banned any tobacco sales whatsoever to persons under age 18. *See* Ex. G (Rossheim et al., "Cigarette Use Before and After the 2009 Flavored Cigarette Ban"); Ex. H (Nat'l Ass'n State Alcohol Drug Abuse Directors, "An Overview of the Synar Provision"); *see also* Ex. I (Shannon M. Farley & Michael Johns, "New York City Flavoured Tobacco Product Sales Ban Evaluation"). The empirical evidence provided by that analogous situation only confirms the intuitively obvious conclusion that removing a product from the marketplace altogether "does [something] more" to prevent that product's use by youth than a simple prohibition on direct sales to youth. ECF 5-2 at 10.

Plaintiffs' protests that the Act is overbroad because it bans the sale of flavored ENDS products even if they do not contain nicotine or tobacco, and speculative assertions that the Act "may actually be inimical to the public health, as it prevents adults over the age of 21 from accessing a proven smoking cessation tool[,]" are unavailing. ECF 5-2 at 10-11. "In conducting rational basis review, courts are not tasked with deciding whether a better or more effective means of classification exists." *González–Droz*, 660 F.3d at 11. "While the [law] may draw an imperfect line, that circumstance alone does not render it unconstitutional. The wisdom of the [legislature's] choice is not within the judiciary's purview." *Id.* Ultimately, Plaintiffs' arguments that the Act fails to advance the State's legitimate public health interests "because it is duplicative, overinclusive in some ways, and underinclusive in others. … arguments ask [the Court] to engage

in a higher level of scrutiny than rational basis review allows." *Gordon v. Holder*, 721 F.3d 638, 657 (D.C. Cir. 2013) (holding that federal ban on shipping tobacco products in the U.S. mail was rationally related to valid goals).

Moreover, Plaintiffs' assertions that the Act is "overbroad", ECF 5-2 at 11, must fail because "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993). Courts may only examine whether a law's means are "tailored" to fit its ends when a constitutional challenge implicates fundamental rights or a suspect classification, such that some form of heightened scrutiny is appropriate—which is not the case here. *Gary S. v. Manchester School District*, 374 F.3d 15, 22 (1st Cir. 2004); *see United States v. Hansen*, 599 U.S. 762, 769 (2023) (discussing First Amendment overbreadth doctrine).

Not only is overbreadth not a permissible reason for finding a law to be irrational under rational basis review, but the law in this case is also not overbroad. In addition to minors, the State possesses a public health interest in limiting and preventing the usage of tobacco and nicotine by persons above the age of 21, and particularly—but not exclusively—persons under the age of 26. *See* ECF 1-4 at 3 ("Youth and young adults up to age 25 are most vulnerable to nicotine's effects[.]"); *see Six Brothers, Inc. v. Town of Brookline*, 228 N.E.3d 565, 582 (Mass. 2024) (citing *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000), for the proposition that limiting tobacco use among adults, as well as among children and adolescents, is a valid public health interest). The State also has a valid public health interest in restricting access to flavored ENDS products that do not contain tobacco and nicotine. "[M]ost ENDS products contain and emit numerous potentially toxic substances other than nicotine, for which long-term studies have not been conducted; some of these toxins have already been banned by FDA for

human ingestion, and many have not been tested by FDA for inhalation. … CDC has also indicated that ENDS products, including flavored ENDS products, can contain other harmful substances in addiction to nicotine." Ex. D.  Plaintiffs do not, and cannot, argue that banning the sale of flavored ENDS products is not a rational means of preventing persons of all ages from using those products. As such, Plaintiffs clearly cannot show a likelihood of success on the merits of their claims that the Act is irrational.

### 2. Plaintiffs Will Not be Excluded From Practicing Their Chosen Profession and the Act Does Not Strip Plaintiffs of Any Fundamental Rights

Plaintiffs also cannot show a likelihood of success on their claim that the Act violates their "Fourteenth Amendment liberty interest[s]" by "'effectively foreclos[ing]' them from practicing their chosen profession[.]" ECF 5-2 at 11 (quoting *Adams v. City of Harahan*, 95 F.4th 908, 914 (5th Cir. 2024).  It is well established that "[t]he right to 'make a living' is not a 'fundamental right,' for either equal protection or substantive due process purposes." *Mulero-Carrillo*, 790 F.3d at 107. "Here, Plaintiffs do not"—and cannot—"allege that they belong to a suspect category" or that there is "a fundamental constitutional right" to own and operate a retail store specializing in the retail sale of electronic cigarettes and related products. *Id.*; *see* Compl. ¶ 26.

"Therefore, their claim is within an area of social and economic policy," *Mulero-Carrillo*, 790 F.3d at 107, and rational basis review applies—as Plaintiffs concede. ECF 5-2 at 12; *see N.Y. State Trawlers Associationn v. Jorling*, 16 F.3d 1303, 1311 (2d Cir. 1994). ("Persons engaged in an industry affecting the public interest may be subject to state regulation, including licensing schemes. …The state may alter the terms of the licenses (or eliminate the licenses altogether) so long as the alteration (or elimination) is rationally related to a legitimate state interest such as the public health, safety, morals, or general welfare." (citation and quotation marks omitted)).

As previously discussed, it is entirely rational to conclude that banning the sale of flavored ENDS products altogether will do more to advance the public health, including the goal of preventing youth use of those products, than simply limiting their sale to persons above the age of 21. Moreover, as Plaintiffs concede, the only way that the Act affects their ability to pursue their "chosen profession" at all is by banning the sale of one class of products; Plaintiffs are by no means legally barred from operating their stores, let alone foreclosed from pursuing that profession. "It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment."[3] *Bernard v. United Twp. High Sch. Dist. No. 30*, 5 F.3d 1090, 1092 (7th Cir. 1993) (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir.1992); *see id.* (holding that defendants' interference with plaintiff's "efforts to market one particular print[] … did not impede plaintiff's right to pursue the "architectural drawings" trade in any way recognized by the Fourteenth Amendment).

As a result, Plaintiffs cannot overcome the State's rational decision to ban the sale of a product that negatively impacts the public health simply by asserting an interest in pursuing the "profession" of selling that product. "To hold otherwise would lead to absurd results." *Minnesota Deer Farmers Ass'n v. Strommen*, No. CV 23-3907 (JRT/LIB), 2024 WL 3823027, at *4 (D. Minn.

---

[3] Plaintiffs' citations to *Bernard*—and other cases such as *Adams*, *Baillargeon*, and *Campbell*— are inapposite, as those cases dealt with *procedural* due process claims; for example, in *Baillargeon*, plaintiff alleged that her liberty interest in following a chosen profession had been "taken with no procedural protections afforded either before or after." *Baillargeon v. DEA*, 638 F. Supp. 2d 235, 238 (D.R.I. 2009). The mere fact that liberty interests are protected by procedural due process does not mean that they constitute fundamental rights such that heightened scrutiny is appropriate. Moreover, Plaintiffs do not (and cannot) assert any procedural due process challenges to the Act, and they cannot show that the Act does not survive rational basis review. *See Perfect Puppy, Inc. v. City of East Providence*, 98 F. Supp. 3d 408, 422 & n.15 (D.R.I. 2015) (holding that plaintiffs had not stated procedural due process claims and such claims did not apply to passage of an ordinance, and that ordinance survived substantive due process and equal protection challenges under rational basis test).

Aug. 14, 2024).  "For instance, lead paint, asbestos, and ethylene oxide are banned because of their negative impact on public health. … But under Plaintiffs' theory, an individual who operates or works for a company that manufactures such substances would be constitutionally entitled to carry on their dangerous activities." *Id.* That is clearly not the law.

### 3.  Plaintiffs Have Not Shown a Likelihood of Success on their Claim that the Act is Unconstitutionally Vague

Plaintiffs also cannot show a likelihood of success on their claim that the Act  is unconstitutionally vague. ECF 5-2 at 12.  "To comport with the strictures of due process, a law must define an offense '[1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 13-14 (1st Cir. 2011) (quoting *Skilling v. United States*, 561 U.S. 358, (2010)).  Notably, to succeed on facial vagueness challenges that do not implicate First Amendment interests—such as the one Plaintiffs advance— a "complainant must demonstrate that the law is impermissibly vague in all of its applications." *Id.* (quoting *Whiting v. Town of Westerly*, 942 F.2d 18, 22 (1st Cir. 1991)).

Plaintiffs' vagueness challenge is based on their assertion that the Act's use of the term "characterizing flavor" is impermissibly vague; however, the Act expressly defines that term in great detail. *See* Section I, *supra* (quoting R.I. Gen. Laws § 44-20-61(a)(1)).  And Plaintiffs clearly have an actual understanding of what that definition means, as they have submitted sworn affidavits asserting that the flavored ENDS ban in the Act will eliminate a substantial portion of their sales. *See* ECF 1-2 at 3; ECF 1-3 at 3.  Plaintiffs could not have made those sworn statements if they did not understand what products were banned.  Clearly, Plaintiffs themselves actually understand that the language of the Act applies to at least *some* of the actual products that are their stock in trade.  That fact alone forecloses any possibility that Plaintiffs could demonstrate that the

Act is "impermissibly vague in *all* of its applications." *URI Student Senate*, 631 F.3d at 14 (emphasis added); *see Whiting*, 942 F.2d at 22 ("[A] plaintiff who engages in conduct that is clearly proscribed by the statute cannot complain that the statute is vague on its face nor challenge the vagueness of the law as applied to the conduct of others.").

Moreover, Plaintiffs' vagueness challenge to the Act's definition of "characterizing flavor" is essentially identical to the vagueness claim rejected in *National Association of Tobacco Outlets, Inc. v. City of Providence*, No. CA 12-96-ML, 2012 WL 6128707 (D.R.I. Dec. 10, 2012), aff'd sub nom. *National Association of Tobacco Outlets, Inc. v. City of Providence, R.I.*, 731 F.3d 71 (1st Cir. 2013). In that case, plaintiffs challenged a City of Providence ordinance that banned the sale of flavored tobacco products and contained a "definition of 'characterizing flavor' … stat[ing] that it includes, but is not limited to, 'tastes and aromas relating to any fruit, chocolate, vanilla, honey, candy, cocoa, dessert, alcoholic beverage, herb or spice'" while "expressly exempt[ing] tobacco products with the distinguishable 'taste or aroma of tobacco, menthol, mint or wintergreen'" from the prohibition. 2012 WL 6128707 at *8, *14. The Court found that "'[t]he mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague,' particularly where 'the statute deals with economic regulation and is addressed to sophisticated businessmen and corporations[,]'" and the "fact that a statute includes a 'non-exhaustive list' of examples does not render the statute vague." *Id.* at *13-14 (quoting *United States v. Lachman*, 387 F .3d 42, 57 (1st Cir. 2004)).

Those same principles apply and defeat Plaintiffs' vagueness claims in this case. The Act primarily defines a characterizing flavor as a "distinguishable taste or aroma, other than the taste or aroma of tobacco or menthol," before going on to provide additional, non-exclusive examples and creating a presumption that a characterizing flavor exists if a "dealer, manufacturer, or

distributor" has claimed that the product "has a distinguishable tase or aroma (other than the taste or aroma or tobacco or menthol)." R.I. Gen. Laws § 44-20-61(a)(1).  The Act's definition of a characterizing flavor as a "distinguishable taste or aroma," together with the list of examples, provides reasonable guidance in ordinary language "that ordinary people can understand[.]" *Lachman*, 387 F.3d at 56.  And nothing about that definition "encourage[s] arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)); *see Grayned*, 408 U.S. at 114 ("As always, enforcement requires the exercise of some degree of police judgment, but, as confined, that degree of judgment here is permissible.").

Plaintiffs can make no headway with hyper-technical readings of the terms of "tobacco and menthol" or other challenges to specific words and phrases in the Act. ECF 5-2 at 13-14; *see United States v. Martínez-Felipe*, 687 F. Supp. 3d 282, 289 (D.P.R. 2023) ("Due process does not demand, however, that [the legislature] account for every conceivable application of a law. Any statute is 'susceptible to clever hypotheticals testing its reach.'" (quoting *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 894 F.3d 235, 251 (6th Cir. 2018))).  A plaintiff cannot hope to show vagueness by plucking statutory terms out of context and then complaining that those isolated terms fail to provide sufficient guidance.  The "challenged phrases do not appear in a vacuum[,]" and the Act "contains additional terms that supply concrete guidance as to the behavior that it prohibits and the circumstances in which it can be enforced." *URI Student Senate*, 631 F.3d at 14.  And Plaintiffs cite no authority for the idea that a statute is unconstitutionally vague because it does not specifically name *who* will enforce it, or because it provides an evidentiary presumption that an ENDS product is flavored because of the way that it has been marketed or advertised. *See* ECF 5-2 at 14; *cf. Thibodeau v. Portuondo*, 486 F.3d 61, 66 (2d Cir. 2007) (Sotomayor, Circuit J.) ("[Petitioner] has cited no cases where courts have applied the void-

for-vagueness doctrine to an evidentiary presumption—and we are unaware of any[.]"); *see id.* at 71 (upholding evidentiary presumption against vagueness challenge). The bottom line is that, viewed in context, it is clear what conduct the [Act] as a whole forbids" and "[o]ne can envision many permissible applications of the [Act]." *URI Student Senate*, 631 F.3d at 15. As a result, Plaintiffs have not shown a likelihood of success on their vagueness claim.

### 4. Plaintiffs Have Not Shown a Likelihood of Success on their Equal Protection Claim

Plaintiffs also have not shown a likelihood of success on their equal protection claim. *See* ECF 5-2 at 15-18. That claim is premised entirely on the portion of the Act providing that "[c]ompassion centers and licensed cultivators registered with the … state of Rhode Island … department of business regulation-office of cannabis regulation under chapter 28.6 of title 21 are exempt from" the ban on sales of this provision "except as to products that contain, are made of, or are derived from tobacco or nicotine, natural or synthetic." R.I. Gen. Laws § 44-20-61. In other words, the Act prohibits Plaintiffs, but not compassion centers and licensed cultivators registered with the Rhode Island Department of Business Regulation's Office of Cannabis Regulation under the "Edward O. Hawkins and Thomas C. Slater Medical Marijuana Act" from selling flavored ENDS products that do not contain tobacco or nicotine.[4] R.I. Gen. Laws § 21-28.6-1.

Plaintiffs cannot manufacture an equal protection claim from that statutory classification. Once again, Plaintiffs do not contend that the law creates any suspect classifications and correctly concede in their Motion that rational basis applies to their equal protection challenge.[5] *See* ECF 5-

---

[4] Conversely, however, compassion centers and licensed cultivators are not exempt from the ban on selling flavored ENDS products that *do* contain tobacco or nicotine; accordingly, that portion of the Act applies to them equally as it does to Plaintiffs, and cannot support any equal protection claim. *See* R.I. Gen. Laws § 44-20-61(b).
[5] Despite making that concession, Plaintiffs promptly attempt to ratchet up the level of scrutiny by asserting that the "Court should 'receive with some skepticism' whatever purpose the State may

2 at 15 (citing *Wine & Spirits Retailers, Inc. v. State of Rhode Island & Providence Plantations*, 364 F. Supp. 2d 172, 180 (D.R.I.), aff'd sub nom. *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36 (1st Cir. 2005)). The United States Supreme Court "has long held that a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012) (internal quotations and citation omitted). Moreover, to establish an equal protection violation, a plaintiff must also show that they have been treated differently from other parties who are similarly situated "in all relevant respects." *Barrington Cove Ltd. P'ship v. R.I. Hou. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001).

Accordingly, to show a likelihood of success on their equal protection claim, Plaintiffs must show that both that they are similarly situated to the compassion centers and licensed cultivators exempted by the Act *and* that there is no rational basis for any disparate treatment. Plaintiffs cannot meet either prong of that test. To begin with, they have not shown and cannot show that they are similarly situated in all relevant respects with compassion centers and licensed cultivators that are registered with the Office of Cannabis Regulation under the Edward O. Hawkins and Thomas C. Slater Medical Marijuana Act. As the name of that statute indicates, compassion centers and licensed cultivators are licensed—and heavily regulated—by the State for

---

proffer" simply because the Act itself "fails to identify a legitimate reason for classifying compassion centers and licensed cultivators differently than Plaintiffs." ECF 5-2 at 16 (quoting *Schweiker v. Wilson*, 450 U.S. 221, 244 (1981) (Powell, J., dissenting)). That is an incorrect statement of the governing law. As the Supreme Court stated in *F.C.C. v. Beach Communications, Inc.*, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." 508 U.S. 307, 315 (1993). "Thus, the absence of legislative facts explaining the distinction [o]n the record[] … has no significance in rational-basis analysis." *Id.* (internal quotation marks and citation omitted).

the explicit and limited purposes of producing and selling medical marijuana.[6] R.I. Gen. Laws § 21-28.6-3, -12, -16; *see* 230-RICR-80-05-1 *et seq.*  Licensed medical marijuana cultivators "shall only sell marijuana to compassion centers" or "another licensed medical marijuana cultivator" and are subject to licensing, oversight, and record-keeping regulations by the Office of Cannabis Regulation. R.I. Gen. Laws § 21-28.6-16.  The application and oversight process for compassion centers is even more stringent. *See* 230-RICR-80-05-1.2(C)(4) (providing that all applications for compassion centers must include, *inter alia*, a non-refundable $10,000 fee, a business plan, a "Security and Safety plan … which specifies how the applicant will ensure security and safety and the licensed premises," and "Operations Manual for the compassion center including policies, procedures and documents" covering 13 specified areas, including record keeping, training of employees, labeling and packaging, advertising, and voluntary and mandatory recalls of medical marijuana products).  The number of compassion center licenses available statewide is also limited by law; currently, there are only seven (7) licensed compassion centers in Rhode Island. R.I. Gen. Laws § 21-28.6-12; *see* Ex. J (Dep't of Business Regulation, "Licensed Compassion Centers".).  By contrast, there are over *four hundred* licensed ENDS dealers in the State. *See* Ex. K (List of

---

[6] Following passage of the Rhode Island Cannabis Act in 2022, registered compassion centers that have obtained "hybrid" licenses may also now sell marijuana products to adults over the age of 21 for non-medical purposes; however, state law places stringent conditions on those sales, including payment of a $125,000 fee and the requirement that the compassion center "be in good standing and maintain its compassion center license" with the Office of Cannabis Regulation. R.I. Gen. Laws § 21-28.11-10 (a).  Although the Rhode Island Cannabis Act also contemplates that the newly created Cannabis Control Commission may issue additional retail licenses, it has not yet done so. R.I. Gen. Laws § 21-28.11-10.2.  The Rhode Island Cannabis Act also provides that the Cannabis Control Commission shall promulgate rules and regulations "regulating and licensing cannabis establishments and the sale, possession and use of cannabis", because the Commission has not yet issued final rules, the Office of Cannabis Regulation's rules are still in legal effect. R.I. Gen. Laws § 21-28.11-5(b); 11-10.1(a).  Moreover, by its terms, the Act's exemption *only* applies to compassion centers and licensed cultivators that are registered under chapter 28.6 of title 21 of the General Laws. *See* R.I. Gen. Laws § 44-20-61.

Active RIDOH ENDS Licenses as of Dec. 13, 2024).  Allowing a class of that size to sell flavored ENDS products would make those products far more prevalent and easily accessible to the State's youth than a class that is significantly smaller.

Moreover, because ENDS dealers like Plaintiffs are not licensed to sell the medical marijuana products sold by compassion centers, Plaintiffs *have not even shown that the two groups are engaged in selling comparable non-nicotine ENDS products*. *See* 230-RICR-80-05-1.7 ("For smokable and vapable forms, DBR will not designate a product as medical marijuana if: … 3. Flavoring or coloring has been added except for flavors or coloring that are derived solely from cannabis and have been procured in accordance with applicable Rhode Island laws."); Ex. L (Dep't of Business Regulation, Amended Product Designation List) at 1 (stating that "Concentrates Intended for Vaporization (Adult-Use and Medical)" must be "100% cannabis with no added ingredients" and "[n]o flavor or coloring … added except those derived solely from cannabis"). In *Wine & Spirits Retailers, Inc.*, the court found that the State's ban on "franchise sales" of alcoholic beverages by chain stores did not violate equal protection by exempting other businesses that sold essentially the same products, given the clear differences between the business models of the two classes; here, not only are the Plaintiffs clearly distinct from compassion centers and licensed cultivators, but there is no showing that they are even dealing in the same products. *See* 364 F. Supp. 2d at 180 (holding that significant differences exist between the relatively small number of retailers who exclusively sell unlimited quantities of alcoholic beverages for off-premises consumption to persons who may or may not be the ultimate consumers" and "the much larger number of restaurants and clubs that dispense alcoholic beverages in measured quantities, often accompanied by food, for on-premises consumption" and that those differences prevented any showing that the two classes were similarly situated for equal protection purposes).

"An individual is 'similarly situated' to others for equal protection purposes when 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" *Davis*, 802 F.3d at 132–33 (1st Cir. 2015). "Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." *Barrington Cove Ltd. P'ship*, 246 F.3d at 8 (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)). By contrast, "Plaintiffs' apples-to-oranges comparison" does not suffice to show a reasonable likelihood of success. *Mulero-Carrillo*, 790 F.3d at 106.

Even assuming for purposes of argument that Plaintiffs could show that they are similarly situated in all relevant respects to the compassion centers and licensed cultivators named in the Act, they certainly cannot show that the Act's exemption lacks any rational basis. "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications, Inc.*, 508 U.S. at 315.

The material distinctions between ENDS dealers and compassion centers (and licensed cultivators) discussed above provide a clearly rational basis for exempting that latter group, which are already heavily regulated by the Edward O. Hawkins and Thomas C. Slater Medical Marijuana Act and the Office of Cannabis Regulation, from the less stringent provisions of the Act (and the Rule). The production and sale of medical marijuana, and cannabis products more generally, clearly present an entirely different set of regulatory concerns than the sale of flavored ENDS products that do not contain cannabis, *Cf. Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916, 922, 926 (9th Cir. 2024) (noting that suit challenging cannabis dispensary permitting scheme

20

"lie[s] at the intersection of conflicting state and federal policies related to marijuana legalization, possession, production, and sale" and "touches on sensitive issues of social policy").  The General Assembly has reasonably chosen to regulate the complex and rapidly changing field of cannabis production and sale through two detailed statues, the Edward O. Hawkins and Thomas C. Slater Medical Marijuana Act and the Rhode Island Cannabis Act, that delegate regulatory responsibility in this area to the state agencies of the Office of Cannabis Regulation and the Cannabis Control Commission.  The Rhode Island Cannabis Act also charged the Cannabis Control Commission with drafting a comprehensive regulatory scheme overseeing the sale and production of all cannabis products in the State, including vaping products, and which must address, *inter alia*, any issues related to youth access or health and safety more generally. *See* R.I. Gen. Laws § 21-28.11-5(b)(17), (18), (19), (27), (28), (32).  It is absolutely rational for the General Assembly to avoid any regulatory conflicts, overlap, or unintended consequences by exempting compassion centers and licensed cultivators from the Act—which was intended to regulate a completely different field and set of products.

Independently, there are also rational public health reasons for the Act's exemption.  For instance, the General Assembly may have reasonably concluded that the risk of youth obtaining flavored ENDS products from one of the hundreds of ENDS dealers throughout the State was a more pressing concern than the risk posed by seven licensed and highly regulated compassion centers, which do not and cannot sell any vaping products that contain artificial flavoring additives. Similarly, the General Assembly could have concluded that the risk posed by the potentially toxic substances found in flavored ENDS products warranted an immediate and outright ban while leaving it to the Office of Cannabis Regulation (and the more recently created Cannabis Control Commission) to decide how best to address any health concerns posed by ENDS products that

21

contain cannabis.[7]  Additionally, given that the cannabis products sold at compassion centers must qualify as medicinal marijuana under state law, it would have been rational for the General Assembly to conclude that the medicinal benefits and purpose of such products warrant them being treated differently, rather than trying to take the additional, cumbersome step of creating new classes of products based on whether they were being sold for medicinal reasons or adult use.

And even assuming for purposes of argument that Plaintiffs are correct in asserting that ENDS products containing cannabis present comparable public health concerns as the flavored ENDS products Plaintiffs wish to sell, "[i]t is settled law that, in addressing what it may perceive as a problem, a state legislature may proceed one step at a time, and that [i]t is no requirement of equal protection that all evils of the same genus be eradicated or none at all[.]" *Wine & Spirits Retailers, Inc.*, 364 F. Supp. 2d at 180-81 (internal quotation marks and citations omitted); *see United States v. Carolene Prods. Co.*, 304 U.S. 144, 151 (1938) ("Appellee raises no valid objection to the present statute by arguing that its prohibition has not been extended to oleomargarine or other butter substitutes in which vegetable fats or oils are substituted for butter fat.  The … equal protection clause[] … of the Fourteenth[] [Amendment] … does not compel [state] Legislatures to prohibit all like evils, or none.  A Legislature may hit at an abuse which it has found, even though it has failed to strike at another."); *Hardison v. State*, 507 P.3d 36, 46 (Wyo. 2022) ("The Wyoming Controlled Substances Act is rationally related to its objectives, and

---

[7] Although no additional, non-cannabis flavorings can be added to cannabis products sold by Rhode Island compassion centers, *see* Ex. L, the presence of naturally occurring organic compounds known as "terpenes" means that cannabis products may have "distinct aromas and flavors" that are "reminiscent" of other plants, such as lavender or citrus fruits. Ex. M (Aura Canna. Co., "Understanding Cannabis Terpenes: Steering the Cannabis Experience").  Notably, evidence shows that those different terpenes and their various combinations significantly contributes to the "medicinal" and experiential characteristics of cannabis products. *See id.*  That evidence further confirms that the State possesses a rational basis to regulate cannabis products in a different fashion from flavored ENDS products that do not contain cannabis.

its failure to include 'distilled spirits, wine, malt beverages, or tobacco' does not deny Mr. Hardison equal protection of the law under the United States Constitution."). "[R]ational basis review is not a license for courts to judge the wisdom, fairness, or logic of legislative choices, … and courts must uphold legislation [e]ven if the classification involved ... is to some extent both underinclusive and overinclusive." *Nicopure Labs, LLC v. Food & Drug Admin.*, 266 F. Supp. 3d 360, 409 (D.D.C. 2017), aff'd, 944 F.3d 267 (D.C. Cir. 2019) ((internal quotation marks and citations omitted).

### 5. Plaintiffs Have Not Shown a Likelihood of Success on their Claim that the Act is an Unconstitutional Taking of their Property

Lastly, Plaintiffs have not shown a reasonable likelihood of success on their claim that the Act is an unconstitutional taking of their property. *See* ECF 5-2 at 18-19. Plaintiffs assert that the Act "goes too far" as a regulation of Plaintiffs' property because they "will be denied 'all economically beneficial or productive use' of their inventory of flavored ENDS products." *Id.* at 18 (quoting *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 52 (1st Cir. 2024)). But as the United States Supreme Court has stated, "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027-28 (1992) (citing *Andrus v. Allard*, 444 U.S. 51, 66-67 (1979)).

Although Plaintiffs cite to *Horne v. Department of Agriculture*, 576 U.S. 350 (2015), that case is clearly distinguishable, as it involved the federal government's appropriation of plaintiffs' raisin crop for the government's own use; notably, the plaintiffs in that case "concede[d] that 'the government may prohibit the sale of raisins without effecting a per se taking.'" 576 U.S. at 362.

Here, the State has not appropriated Plaintiffs' flavored ENDS products for its own use; rather, it has prohibited their sale. Similarly, although Plaintiffs attempt to distinguish *Ocean State Tactical* by complaining that the Act "fails to provide Plaintiffs with any options of what to do with their existing inventory of flavored ENDS products once the ban becomes effective[,]" that argument is unavailing. ECF 5-2 at 18. In *Ocean State Tactical*, the possibility of selling the banned large-capacity magazines LCMs "to a federally licensed firearms dealer or out-of-state resident" was the sole economically beneficial option of disposing of the LCMs specifically identified in the challenged law, but it was obviously not an option that was *created by* that law, or that needed to be created; before the LCM ban existed, the plaintiffs could have pursued that same course. 95 F.4th at 53. Likewise, in this case, both Plaintiffs expressly acknowledge that they retain the option of "[l]iquidating [their] existing inventories of flavored ENDS products" if they are unable to sell them through their Rhode Island stores. ECF 1-2 at 3; ECF 1-3 at 3. As in *Ocean State Tactical*, the fact that that option may be less profitable does not mean that Plaintiffs have lost *all* economically beneficial or productive uses of their property. Plaintiffs have also known about the Act since June 2024 and had ample time to liquidate their inventory before the Act's provisions go into effect.

The Act also provides that ENDS products "that are held for sale or distribution within the borders of this state in violation of the requirements of this chapter or federal law are declared to be contraband goods and may be seized" without a warrant and subsequently destroyed. R.I. Gen. Laws § 44-20-15. But "it is well established that there is no taking for 'public use' where the government acts pursuant to its police power, i.e. where it criminalizes or otherwise outlaws the use or possession of property that presents a danger to the public health and safety." *McCutchen v. United States*, 145 Fed. Cl. 42, 51 (2019); *see Acadia Tech., Inc. v. United States*, 458 F.3d

1327, 1332 (Fed. Cir. 2006) ("A Customs seizure of goods suspected of bearing counterfeit marks is a classic example of the government's exercise of the police power to condemn contraband or noxious goods, an exercise that has not been regarded as a taking for public use for which compensation must be paid."); *United States v. $7,990.00 in U.S. Currency*, 170 F.3d 843, 845 (8th Cir. 1999) ("[T]he forfeiture of contraband is an exercise of the government's police power, not its eminent domain power."); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 391 (D.R.I. 2022) ("Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." (quoting *Akins v. United States*, 82 Fed. Cl. 619, 622 (Fed. Cl. 2008))).

Significantly, any sale of the flavored ENDS products covered by the Act has already been prohibited by the Rule (and emergency regulation) for over five years. While Plaintiffs provide no information about precisely when they purchased their current inventory of flavored ENDS products, it seems safe to assume that most, if not all, of that inventory was purchased within the time frame when those products were already prohibited. It is stunning for Plaintiffs to now accuse the State of unconstitutionally taking products by banning their sale, when it is Plaintiffs who knowingly obtained products that they knew full well they were not allowed to sell in Rhode Island. Plaintiffs cannot show that they have "reasonable investment-backed expectations" to continue to act as retailers of a product that was already prohibited by state law when they obtained it. *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001).

In addition, Plaintiffs are also barred from relying on their takings claim as a basis for their desired preliminary injunction because injunctive relief is not available as a remedy for takings claims. *See Knick v. Township of Scott, Pa.*, 588 U.S. 180, 205 (2019) ("As long as just compensation remedies are available … injunctive relief will be foreclosed."); *Restivo v. Lynch*,

707 A.2d 663, 669 n.7 (R.I. 1998) (recognizing inverse condemnation as a remedy for takings claims under Rhode Island law).  "It is well settled that interim equitable relief is only available when a plaintiff can obtain at least some final equitable relief." *Exotic Smoke & Vape v. Cox*, No. 2:22-CV-408, 2022 WL 2316323, at *1 (D. Utah June 28, 2022).  Here, even if there was a taking, compensation remedies would be available and as such, the taking would not provide a basis for a preliminary injunction.

**B.  Plaintiffs Have Not Established a Likelihood of Irreparable Harm**

Turning to the second prong of the preliminary injunction inquiry, Plaintiffs also have not shown that they are likely to suffer irreparable harm without an injunction.  Plaintiffs argue that "[c]onstitutional violations … are presumed to demonstrate irreparable harm[,]" but that principle does not apply here. ECF 5-2 at 19 (quoting *Taylor v. Conn. Dep't of Corrections*, C.A. No. 05-118 T, 2005 WL 8174479, at *1 (D.R.I. Sept. 21, 2005)).  As previously discussed, Plaintiffs have "failed to demonstrate any constitutional violations." *Taylor*, 2005 WL 8174479 at *1.

Although Plaintiffs also assert that enforcement of the Act will "cause their businesses to close[,]" the most that Plaintiffs have shown is that such those outcomes are possible, not that they are likely. ECF 5-2 at 20.  Plaintiffs' dire forecasts of their business prospects rely on speculative predictions as to what choices Rhode Island consumers will make if they are unable to buy flavored ENDS products from Plaintiffs or from other ENDS dealers in Rhode Island. *See id.* ("If Plaintiffs cannot sell flavored ENDS products to these customers, these customers *may* choose to stop frequenting their stores[.]") (emphasis added).  Moreover, data on the actual effect of banning flavored e-cigarettes and other flavored tobacco products "demonstrate that tobacco retail businesses have successfully adapted to changes in market conditions, including the implementation of tobacco product flavor bans." *See* Ex. N (John A. Tauras & Frank J. Chaloupka,

"The Economic Effects of Cigarette Sales and Flavor Bans on Tobacco Retail Businesses") at 2. Similarly, Plaintiffs can take reasonable steps to adapt by modifying their business models. "[A] plaintiff's showing must possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). And "[i]t is a longstanding axiom that "economic harm in and of itself is not sufficient to constitute irreparable injury." *OfficeMax Inc. v. County Qwick Print, Inc.*, 709 F. Supp. 2d 100, 113 (D. Me. 2010) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 74 (D. Me. 1993))

Additionally, a "preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Fiba Leasing Co. v. Airdyne Industries, Inc.*, 826 F. Supp. 38, 39 (D. Mass. 1993) (citing *San Francisco Real Estate v. Real Estate Invest. Trust of America*, 692 F.2d 814, 818 (1st Cir. 1982)). As of the date of this filing, the sale of flavored ENDS products is already prohibited by state law and has been prohibited for over five years. Plaintiffs acknowledge in their filings that they are and have been fully aware of both the emergency regulation and the Rule, but have nevertheless continued stock and sell flavored ENDS products in defiance of the state law prohibition. *See* Compl. ¶¶ 33-37, 41-48. Plaintiffs are not entitled to the extraordinary remedy of preliminary injunctive relief when the irreparable harm they forecast is an entirely foreseeable consequence of their own choices to continue to build their business models around a legally prohibited activity.

Similarly, Plaintiffs' assertions that irreparable harm is imminent are undercut by the fact that they waited approximately five months after the Act was passed—and approximately five *years* after the emergency regulation was passed—to file suit in an attempt to enjoin the State's ban on sales of flavored ENDS products. *See* Compl. ¶¶ 41-48. "Unwarranted delay in seeking a

27

preliminary injunction ... undercuts the movant's claim of irreparable injury." *Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 98 (D. Mass. 1996) (quoting *Fabrication Enterprises, Inc. v. Hygenic Corp.*, 64 F.3d 53, 61 (2d Cir. 1995)); *see Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.").

Awarding preliminary injunctive relief at the outset of a case and before the record has fully developed is an extraordinary remedy that is only warranted when circumstances make it so that such relief must be awarded on an emergency expedited basis.  Here, any "emergency" is entirely of Plaintiff's own creation.  Had Plaintiffs filed suit promptly after the Act was passed in June 2024, there would have been ample time for development of the record and a careful review of these issues and no need for Defendants and the Court to have to brief and decide these issues on such a truncated schedule.  Plaintiffs forcing these issues to be decided on a rushed basis is even more problematic given that they are asking the Court to take the weighty step of declaring democratically enacted legislation unconstitutional.  It was Plaintiffs' decision to file suit at the eleventh hour that created the so-called emergency that they now rely upon to seek preliminary injunctive relief, and they should not be allowed to create their own purported emergency by their delay.  "It is trite, but true, that equity ministers to the vigilant, not to those who sleep upon their rights." *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 879 (1st Cir. 1995); *see Benisek v. Lamone*, 585 U.S. 155, 159 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence.").

**C. The Balance of the Equities and the Public Interest Tips Heavily in the State's Favor**

Finally, the balance of the equities and the public interest weigh heavily in favor of denying Plaintiffs' Motion. In this inquiry, the court must consider the "risk of irreparable harm to the party seeking the injunction, as balanced against the harm to the party opposing it, and the public policy interests implicated by the issuance (or not) of an injunction." *Harris v. Wall*, 217 F. Supp. 3d 541, 560 (D.R.I. 2016). As previously discussed, any irreparable harm forecast by the Plaintiffs is speculative and ultimately self-inflicted on their part, given that they have knowingly chosen to purchase and invest in the sale of a product that has been prohibited by law for the past five years. Conversely, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Col. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

The public policy interests at stake also heavily favor the Defendants. Here, the General Assembly passed the Act to "protect young people and other vulnerable populations from unintended harm, promote community health, and establish supportive environments that empower freedom from addiction." ECF 1-4 at 4. "Tobacco/nicotine use among Rhode Island youth poses a significant public health challenge[,]" and the data indicate that youth are far more likely to use flavored ENDS products than any other tobacco product. *Id.* at 6; *see id.* at 5; Ex. O (CDC, "E-Cigarette Use Among Youth); Ex. P (Campaign for Tobacco-Free Kids, "Flavored Products Hook Kids"); Ex. Q (Campaign for Tobacco-Free Kids, "Ending the Sale of Flavored Tobacco Products").

"The safety and the health of the people of [the state] are, in the first instance, for that [state] to guard and protect." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 38

(1905); *see Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991). ("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals[.]"). For example, the Supreme Court has declined to prevent States from enforcing health-related regulations that could be harmful to a minority but benefit the majority of its citizens. *See Jacobson*, 197 U.S. at 38 (stating that the Court was "unwilling to hold . . . that one person, or a minority of persons, residing in any community and enjoying the benefits of its local government, should have the power thus to dominate the majority when supported in their action by the authority of the state"). Following these principles, federal courts also declined to grant injunctions to various businesses economically affected by the restrictions during the COVID-19 pandemic. *See e.g., Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760 (W.D.N.Y. 2020); *Hopkins Hawley LLC v. Cuomo*, 518 F. Supp. 3d 705 (S.D.N.Y. 2021). Similarly, the State's interest in protecting the public health significantly outweighs any economic harm that Plaintiffs could experience from being unable to sell flavored ENDS products, especially when any harm is a consequence of Plaintiffs' ongoing refusal to comply with the sales ban that *is already in place*. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 564 (2001) ("The State's interest in preventing underage tobacco use is substantial, and even compelling[.]").

Furthermore, since the Act was passed in June 2024, the Rhode Island Division of Taxation has invested significant time, effort and resources in order to prepare for its scheduled enforcement of the Act after January 1, 2025. *See* Ex. R (Declaration of Tax Administrator Neena S. Savage). "Since the week of June 23, 2024, the Division held approximately at least five (5) meetings per week across several units in the Division to develop and implement its ENDS administration and enforcement project plan." *Id.* ¶ 7. The Division has conducted extensive internal trainings, hired additional staff, and updated its forms and internal software system. *See*

30

*id.* at ¶¶ 8, 9, 14.  In addition to its internal efforts, the Division has also conducted extensive public-facing outreach, including educational efforts aimed at informing retailers of ENDS products. *See id.* ¶¶ 10-11; *see also* Ex. E; Ex. F.  Granting Plaintiffs' Motion would prejudice the Defendants, the State, and the public interest by thwarting these efforts, which are now in their "final stages of deployment." Ex. R ¶ 15.  And if the Defendants were suddenly forced to reverse course and act in a manner contrary to the messaging that has been put out to the public and businesses, it would spark significant confusion.

Moreover, given that Plaintiffs have asked the Court to enjoin enforcement of both the Act and the Rule—as they must, in order to be able to legally sell flavored ENDS products in Rhode Island—Plaintiffs are not simply asking this Court to press pause on a new legal regime that has not yet gone into effect; instead, they are asking this Court to affirmatively change what has been the law for years by substituting its judgment for that of the General Assembly and the Rhode Island Department of Health on the question of how best to protect the public health—an issue that falls squarely within the State's police powers, and which Plaintiffs concede is properly subject to rational basis review.[8]   Under those circumstances, the balance of equities clearly favors the Defendants.

---

[8] By asking this Court to enjoin the administration and enforcement of a law that has been in effect for years, Plaintiffs' attack on the Rule is an attempt to "disturb[] the status quo" that should be "subject to heightened scrutiny," similar to requests for mandatory preliminary relief. *Robinson v. Wall*, No. C.A. 09-277-S, 2013 WL 4039027, at *2 (D.R.I. Aug. 7, 2013); *see CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc*., 48 F.3d 618, 620 (1st Cir. 1995) ("The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation"); *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 893 (1st Cir. 1988) (describing the status quo as "the last *uncontested* status which preceded the pending controversy").  Ultimately, however, the question is academic, as Plaintiffs cannot meet the standard for preliminary injunctive relief under any level of scrutiny.

## IV.    CONCLUSION

For the reasons stated above, the Defendants respectfully request that the Court deny the

Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully Submitted,

Defendants**,**
**RHODE ISLAND DEPARTMENT OF**
**REVENUE; THOMAS VERDI, in his**
**official capacity as Director of the**
**Department of Revenue; RHODE**
**ISLAND DIVISION OF TAXATION;**
**NEENA S. SAVAGE, in her official**
**capacity as Tax Administrator for the**
**State of Rhode Island; RHODE ISLAND**
**DEPARTMENT OF HEALTH; and**
**JEROME LARKIN, MD, in his official**
**capacity as Director of the Rhode Island**
**Department of Health,**

By:
**PETER F. NERONHA**
**ATTORNEY GENERAL**

*/s/ Jeff Kidd*
Jeff Kidd (#10416)
Special Assistant Attorney General
150 South Main St.
Providence, RI 02903
Tel: (401) 274-4400
Fax: (401) 222-2995
jkidd@riag.ri.gov

## CERTIFICATE OF SERVICE

I hereby certify that I filed the within document via the ECF filing system on December 16, 2024
and that a copy is available for viewing and downloading.

*/s/ Jeff Kidd*